Sarah M. Matz (SBN 312051)
ADELMAN MATZ P.C.
1645 North Vine Street, Suite 809
Los Angeles, California 90028
P: (646) 650-2207
F: (646) 650-2108
E-Mail: sarah@adelmanmatz.com

*Attorneys for Plaintiffs Internet Money
Records, LLC and Taz Taylor Beats,
LLC*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **INTERNET MONEY RECORDS, LLC**, a Florida limited liability company; and **TAZ TAYLOR BEATS, LLC**, a Florida limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>**TENTHOUSAND PROJECTS, LLC**, a Delaware limited liability company; **TENTHOUSAND MUSIC PUBLISHING, LLC**, a Delaware limited liability company; **TENTHOUSAND PROJECTS HOLDINGS, LLC**, a Delaware limited liability company; **WARNER MUSIC GROUP CORP**, a Delaware corporation; and **WARNER MUSIC INC.**, a Delaware corporation,<br><br>Defendants. | Case No.: 2:25-cv-10614<br><br>**COMPLAINT**<br><br>1) **Breach of Contract (IMR against 10K, 10K Holdings and the Warner Parties)**<br><br>2) **Accounting (IMR against 10K, 10K Holdings and the Warner Parties)**<br><br>3) **Breach of Fiduciary Duty (IMR against 10K, 10K Holdings and the Warner Parties)**<br><br>4) **Breach of Contract (Taz Taylor Beats against 10K Parties)**<br><br>5) **Promissory Estoppel (Taz Taylor Beats against 10K Parties)**<br><br>6) **In the alternative, Fraudulent Inducement (Taz Taylor Beats against the 10K Parties)**<br><br>7) **In the alternative, Unjust Enrichment (Taz Taylor** |

Beats against 10K Parties)

8) **Accounting (Taz Taylor Beats against the 10K Parties)**

9) **Breach of Fiduciary Duty (Taz Taylor Beats against the 10K Parties)**

10) **Declaratory Judgment (Taz Taylor Beats against the 10K Parties)**

**JURY TRIAL DEMANDED**

Plaintiffs, Internet Money Records, LLC ("IMR") and Taz Taylor Beats, LLC ("Taz Taylor Beats") (collectively, "Plaintiffs"), by and through their attorneys Adelman Matz P.C., hereby file the instant complaint, as and for their claims against Defendants, TenThousand Projects, LLC ("10K"), TenThousand Music Publishing, LLC ("10K Publishing") (10K and 10K Publishing collectively, the "10K Parties"), TenThousand Projects Holdings, LLC ("10K Holdings"), Warner Music Group Corp. ("WMG") and Warner Music Inc. ("Warner") (WMG and Warner collectively, the "Warner Parties") (the 10K Parties and the Warner Parties collectively, the "Defendants") and in support thereof allege as follows:

## **NATURE OF THE ACTION**

1.      This is an action for breach of contract, accounting, breach of fiduciary duty, promissory estoppel and alternative claims of fraudulent inducement and/or omission and unjust enrichment and declaratory judgment.

2.      As set forth herein Defendants in this action have engaged in a pattern of misconduct, indeed breaching every promise and obligation that was owed to the Plaintiffs, which are an independent record label and independent publisher built on

the hard work and relationships of their founder Danny Snodgrass, Jr. p/k/a "Taz Taylor" ("Taz").

3.     Taz, the son of a local musician built his career himself, producing beats and selling them online. Through Taz's hard work and talent, the Plaintiffs have been responsible for multiple Billboard Hot 100 singles and earned RIAA Platinum and Gold certificates.

4.     Plaintiffs engaged in a series of relationships with the 10K Parties which were designed to help grow a catalogue of musical recordings and compositions that both Plaintiffs and the 10K Parties could profit from.

5.     Unfortunately, the Defendants, in violation of their obligations to Plaintiffs, parties have acted in such a manner that they are the only entities who have benefited from this relationship.

6.     Despite years of hard work and good faith performance by Plaintiffs, which resulted in building a world-renowned reputation for 10K and 10K Publishing and a tremendously valuable catalogue that has made at tens of millions of dollars for the Defendants, and enabled the 10K Parties to sell to WMG for upon information belief over two hundred million dollars ($200,000,000.00), the Defendants have repeatedly failed to honor their contractual obligations to Plaintiffs.

7.     As further set forth below, despite IMR and 10K agreeing to operate as partners in a record label joint venture, each with contractual approval rights, 10K has spent millions of dollars without approval from IMR, deducting it from IMR's share of profits, giving no visibility into the revenues collected or expenses incurred and moving deductions between accounts, in violation of all of their agreements, to avoid having to simply pay IMR its fair and contractually agreed to share of profits. Even now, and after the 10K Parties and 10K Holdings were acquired by the Warner Parties, Defendants have failed to address and fix these issues or even allow IMR to audit the deficient statements that have been rendered. Similarly, on the publishing side, the 10K Parties have failed to account to and pay Taz Taylor Beats pursuant to the joint

venture the parties discussed and agreed to and have tried to keep all of the benefit for themselves.

8.      After repeated attempts to resolve these issues amicably it has become clear that the Defendants have no intention of doing so, and as a result Plaintiffs have been forced to commence this suit.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a) and (c) because the amount in controversy exceeds $75,000, and the dispute is between citizens of different states.

10.      IMR is a Florida limited liability company, with all of its members residing in the state of Florida.

11.      Taz Taylor Beats is a Florida limited liability company, with all of its members residing in the state of Florida.

12.      Upon information and belief, 10K is a Delaware limited liability company, with all of its members residing in the state of California, Delaware or New York.

13.      Upon information and belief, 10K Publishing is a Delaware limited liability company, with all of its members residing in the state of California, Delaware or New York.

14.      Upon information and belief, 10K Holdings is a Delaware limited liability company, with all of its members residing in the state of California, Delaware or New York.

15.      Upon information and belief, WMG is a Delaware corporation, with a principal place of business located in the state of New York.

16.      Upon information and belief, Warner is a Delaware corporation with a principal place of business located in the state of New York.

17.      This Court has personal jurisdiction over Defendants because, upon information and belief, Defendants conduct systematic and continuous business in this

1    State and Judicial District, and the wrongful acts alleged in this Complaint occurred in

2    this Judicial District.

3         18.    Upon information and belief, venue is proper in the Central District of

4    California pursuant to 28 U.S.C. §1391(a) and (b) because a substantial part of the

5    events and omissions giving rise to this claim, occurred in this Judicial District and

6    Defendants are subject to personal jurisdiction in this Judicial District.

7                                      **PARTIES**

8         19.    IMR is a limited liability company organized under the laws of Florida,

9    with its principal place of business at 10438 Dodd Rd., Jacksonville, Florida 32218.

10        20.    Taz Taylor Beats is a limited liability company organized under the laws

11   of Florida, with its principal place of business at 10438 Dodd Rd., Jacksonville, Florida

12   32218.

13        21.    Upon information and belief, 10K is a limited liability company

14   organized under the laws of Delaware, with its principal place of business at 12100

15   Wilshire Blvd., Suite 1100, Los Angeles, California 90025.

16        22.    Upon information and belief, 10K Publishing is a limited liability

17   company organized under the laws of Delaware, with its principal place of business at

18   1880 Century Park East, Suite 1600, Los Angeles, California 90067.

19        23.    Upon information and belief, 10K Holdings is a limited liability company

20   organized under the laws of Delaware, with its principal place of business at 12100

21   Wilshire Blvd., Suite 1100, Los Angeles, California 90025.

22        24.    Upon information and belief, WMG is a corporation organized under the

23   laws of Delaware, with its principal place of business at 1633 Broadway, New York,

24   New York 10019.

25        25.    Upon information and belief, Warner is a corporation organized under the

26   laws of Delaware, with its principal place of business at 1633 Broadway, New York,

27   New York 10019.

28                              **FACTUAL ALLEGATIONS**

## I.    Identity of the Parties

26.    Plaintiff IMR is an independent record label founded by producer and CEO Danny Snodgrass, Jr. p/k/a "Taz Taylor" ("Taz"), which was officially formed as a Florida limited liability company on March 16, 2018.

27.    In addition to founding IMR, Taz is also a writer and founder of his publishing company, Plaintiff Taz Taylor Beats, which was founded in March of 2013.

28.    Upon information and belief, 10K is an independent hip-hop record label that was originally founded by its CEO, Elliot Grainge ("Grainge").

29.    Upon information and belief, 10K Publishing is 10K's affiliated music publishing company.

30.    Upon information and belief 10K Holdings was formed on August 21, 2023.

31.    Upon information and belief, Warner is a record label owned by WMG that entered into a joint venture with the 10K Parties in or around September of 2023. Upon information and belief, in September of 2023, WMG acquired a controlling interest in the 10K Parties' affiliated company, TenThousand Projects Holdings, LLC pursuant to the terms of a unit purchase agreement between Warner, 10K and 10K Holdings (the "Warner Purchase").

32.    Upon information and belief, directly prior to or as part of the Warner Purchase, 10K Holdings became the sole and/or majority owner of 10K and 10K Publishing, and as a result WMG and Warner, through 10K Holdings controls the operations of 10K and 10K Publishing.

## II.    Formation of the Joint Venture between IMR and 10K

33.    In 2019, 10K and IMR entered into a joint venture label agreement, with the shared objective of combining IMR's talent finding and acquisition expertise with 10K's label to sign and release artists under a co-branded label, sharing equally in ownership, revenues, and decision-making authority (the "Joint Venture" or "JV").

34.     The JV was memorialized in a written agreement between 10K and IMR dated August 15, 2019, which set forth the material terms of the exclusive label agreement between 10K and IMR (the "Label Agreement").

35.     Under the Label Agreement, the parties agreed to a three-year initial term beginning August 15, 2019 and ending August 15, 2022, unless otherwise extended (the "Initial Term").

36.     The Label Agreement established an equal 50/50 split of Net Profits between IMR and 10K for all Label Artists, as defined below.

37.     The Label Agreement obligated IMR to render talent finding/scouting services and record executive services exclusively to 10K with respect to recording artists and recordings recorded pursuant to the JV's artist agreements.

38.     Specifically, the Label Agreement required the submission of a minimum number of available artists per Contract Year.  Available artists were considered to be unsigned recording artists willing to enter into a recording agreement with 10K under the "Internet Money/10K" imprint to include terms mutually agreed upon by IMR and 10K (the "Artist Agreement[s]").

39.     "Label Artists" under the Label Agreement were defined as "a recording artist signed to an Artist Agreement".

40.     A third artist, iann dior, was explicitly not considered a Label Artist under the agreement; however, the Label Agreement provided that Taz would receive profit participation from 10K with respect to iann dior, and such profit participation would be "governed by a separated agreement between 10K and Taz, whereby Taz would be accounted to on a semi-annual basis".

41.     10K was responsible for handling all distribution, sales, marketing, and administration for Label Artists, together with all necessary administration, including finance, business affairs and royalty accounting for each Artist Agreement, subject to IMR's contractual approval rights.

42.     The Label Agreement granted 10K a thirty percent (30%) Distribution Fee, which was calculated based on Gross Revenue (the "Distribution Fee").

43.     The Label Agreement required mutual approval between IMR and 10K for all creative decision-making with respect to all Label Artists.

44.     The Label Agreement also required IMR's approval for the following for Label Artists: (i) recording budgets/funds; (ii) for each recording project, the initial marketing plan and any material deviations therefrom and budget therefore; and (iii) "all other business decisions".

45.     Under the Label Agreement, 10K and IMR agreed to an annual fund that was to be administered by 10K and allocated between A&R/recording costs and marketing expenses, with any reallocation of funds subject to the parties' mutual approval (the "Fund").

46.     10K also agreed to pay IMR annual overhead payments that were treated as an expense under the JV.

47.     10K also agreed to pay IMR a profit advance of one million three hundred twelve thousand five hundred dollars ($1,312,500.00) (the "Profit Advance") under the Label Agreement, and the Profit Advance was chargeable and recoupable from IMR's fifty percent (50%) share of the Net Profits from the JV (the "Main JV Account").

48.     The term Profit Advance is specifically defined in the Label Agreement as "prepayment of [IMR's] share of Net Profits under [the Label Agreement]".

49.     Net Profits is defined in the Label Agreement as Net Revenue less Deductions ("Net Profits"), which are defined as "actual, direct, verifiable out-of-pocket third party costs and expenses paid or incurred by 10K in connection with Arist Agreements" ("Deductions").

50.     Accordingly, any Deductions incurred by 10K in connection with Artist Agreements had a direct effect on IMR's Net Profits.

51.     The Label Agreement further provided that all worldwide right, title, and interest in and to the master recordings (the "Recordings") and other materials (the "Materials") created by Label Artists under the Artist Agreements would initially be owned by 10K.

52.     However, the Label Agreement expressly assigned copyright ownership to IMR over the three (3) year Initial Term in identified percentages upon the completion of each Contract Year, culminating in IMR's fifty percent (50%) ownership interest in all Recordings and Materials created under the JV.

53.     Together, the foregoing terms established a true joint venture relationship between 10K and IMR, reflecting equal ownership, shared financial risk, and joint creative control, and requiring the parties to act with mutual trust, good faith, and transparency in the operation of the JV.

### III.     The Parties' Amendment to the Label Agreement

54.     After the execution of the JV, Taz began creating and producing recorded music released under the artist's name "Internet Money" (referred to herein as the "Artist").

55.     Although not contemplated in the Label Agreement, the Artists' recordings, including "Somebody", the album "B4 The Storm", which included the hit track "Lemonade", "Jetski", and "His & Hers" (the "Artist Recordings") were released through the JV.

56.     However, the Artist was not a Label Artist under the Label Agreement and Artist maintained ownership of all of the copyrights in and to the Artist Recordings.

57.     Following the release of Artist Recordings, the Artist Recordings became immensely popular and were bringing in significant revenue, although at that time the parties did not have a formal agreement about how those revenues would be treated.

58.     In 2020, IMR and 10K negotiated an amendment to the Label Agreement to formalize an arrangement for the Artist Recordings to be distributed through the JV

and *inter alia* to extend the Initial Term of the JV by three (3) years in the amendment to the Label Agreement dated as of August 20, 2020 (the "Amendment") (the Label Agreement and Amendment collectively, the "Agreements").

59.    In exchange for the extension of the Initial Term, the Amendment also required 10K to pay an additional Profit Advance of two million dollars ($2,000,000.00) (the "Additional Profit Advance").

60.    The term "Profit Advance" in the Amendment had the same meaning in the Amendment as in the Label Agreement because the Amendment expressly provided that "all capitalized terms used [in the Amendment] shall have the meanings assigned to them in the Label Agreement".

61.    The Additional Profit Advance and the Profit Advance are collectively referred to as the "Profit Advances".

62.    The Amendment redefined and extended the Initial Term of the Label Agreement, providing that the Agreement would continue for an additional three (3) years—from June 14, 2021, through June 13, 2024 (the "Amended Term")—and expressly substituted this new period for the Initial Term, thereby establishing the Amended Term of the Joint Venture.

63.    The Amendment incorporated by reference an Artist Term Sheet attached to the Amendment as the "Artist Agreement" (referred to herein as the "Artist Term Sheet").

64.    Under the Amendment, 10K and IMR were granted the exclusive rights to distribute, exploit, and release all Artist Recordings throughout the Amended Term pursuant to the Label Agreement and Artist Term Sheet.

65.    The Amendment also expressly assigned to IMR a fifty percent (50%) ownership interest in all copyrights in and to the Artist Recordings and related Materials.

66.    Under the Label Agreement, 10K's Profit Advance to IMR was chargeable against and recoupable only from Net Profits thereunder.

67. Accordingly, the Additional Profit Advance that 10K paid to IMR under the Amendment was also required to be recouped from Net Profits.

68. Indeed, the Amendment specifically stated that [n]otwithstanding anything to the contrary contained in paragraph 9 of the Label Agreement, all Net Profits, Gross Revenues and Deductions with respect to the Artist Recordings (the "Artist Recordings Account") shall be placed in a separate account which shall not be cross-collateralized Main JV Account defined in the Amendment as Net Profits, Gross Revenues or Deductions under the Label Agreement (the "Main JV Account").

69. The Amendment permitted 10K to apply up to fifty percent (50%) of IMR's Net Profits from the Artist Recordings Account toward recoupment of the Profit Advances in the Main JV Account, but requiring separate accounting treatment otherwise.

70. The Amendment increased the annual A&R Recording Costs/Marketing Fund; however, any reallocation of the Fund still required mutual approval under the Amendment.

71. The Amendment also redefined and replaced the Distribution Fee of the Label Agreement from a thirty percent (30%) fee to a twenty percent (20%) Distribution Fee.

72. Except as otherwise specifically modified, all other provisions of the Label Agreement remained in full force and effect.

73. As such, 10K's obligation to account to IMR on a semi-annual basis under the Label Agreement was not specifically modified by the Amendment and therefore remained in full force and effect throughout the entirety of the Amended Term.

74. By its terms, the Amendment further confirmed the joint ownership structure and mutual obligations of good faith, transparency, and shared creative control that characterized the parties' JV.

**IV.    10K's Unauthorized Spending and Accounting Breaches**

75.    IMR fully performed its obligations under the Agreements by rendering talent finding/scouting services and record executive services exclusively to 10K.

76.    10K, however, during the Term of the Agreements and thereafter, engaged in a consistent and repeated pattern of violations and breaches of its obligations under the Agreements in numerous ways.

77.    Under the Label Agreement, 10K was required to obtain IMR's approval in connection with all creative and business decision-making with respect to all Label Artists, including with without limitation all creative decision-making (i) recording budgets/funds, (ii) for each recording project, the initial marketing plan and any material deviations therefrom and budget therefore, and (iii) "all other business decisions"; this approval requirement was not modified by the Amendment and therefore also remained in full force and effect under the Amendment.

78.    Additionally, both the Label Agreement and Amendment explicitly required 10K to obtain IMR's approval for any reallocation of the A&R Recording Costs/Marketing Fund.

79.    Upon information and belief, 10K failed to comply with these approval requirements and unilaterally incurred and charged tens of millions of dollars in Deductions to the Artist Recording Account and Main JV Account without IMR's knowledge or approval, and without providing a full and accurate accounting of Deductions or Gross Revenues.

80.    Upon information and belief, 10K never accounted to IMR for the period ending on December 31, 2019.

81.    The first two (2) semi-annual accountings delivered to IMR under the Label Agreement for the first and second half of 2020 (the "2020-1H Statement" and "2020-2H Statement", respectively) were delivered to IMR months late and contained a deficient breakdown of Gross Revenue and Deductions incurred during those periods.

82.    In the first semi-annual accounting rendered after the Amendment was entered into, for the first half of 2021 (the "2021-1H Statement"), 10K reflected Deductions in excess of six million dollars ($6,000,000.00) under the Artist Recordings Account and nearly four million dollars ($4,000,000.00) under the Main JV Account, but failed to include any breakdown of those Deductions, thereby preventing IMR from determining the nature, purpose, or legitimacy of the amounts charged or whether they had been approved.

83.    The  2021-1H Statement also failed to include any breakdown of Gross Revenues; instead, Gross Revenues were aggregated in a lump sum under each artist with no attached income statements and therefore no indication of the source, platform, or composition of those Gross Revenues, costs deducted or whether third party royalty participants were being properly paid.

84.    As a result, IMR had no ability to verify the accuracy of the reported Gross Revenues or Deductions, to confirm the Distribution Fee was being appropriately applied or to confirm whether payments due to producers, featured artists, or participating labels had been properly allocated or remitted.

85.    The 2021-1H Statement allocated the Profit Advances against the Main JV Account, and at the end of that period the Artist Recording Account was unrecouped by approximately only forty thousand dollars ($40,000.00).

86.    The accounting statement for the second half of 2021, which reported on both the Main JV Account and the Artist Recordings Account (the "2021-2H Statement"), reflected a further increase in both reported Gross Revenues and Deductions, but, like the prior statement, provided no itemization or supporting documentation.

87.    The 2021-2H Statement also reflected that the Artist Recordings Account had become profitable and payable at that point, showing total Net Profits of approximately one million four hundred sixty-two thousand dollars ($1,462,000.00).

88.    Pursuant to the Amendment, half of IMR's share of such Net Profits under the Artist Recordings Account, i.e. approximately seven hundred thirty-one thousand dollars ($731,000.00), was to be paid to IMR, with the remaining half applied towards the unrecouped portion of the Profit Advance under the Main JV Account.

89.    However, without notice or approval from IMR, and in violation of the Agreements, in the 2021-2H Statement 10K reclassified and transferred the Additional Profit Advance from the Main JV Account, as it had been allocated in the 2021-1H Statement, to the Artist Recordings Account, recouping that amount solely against IMR's Net Profits under the Artist Recordings Account (the "False Classification").

90.    The False Classification was a material breach of the Agreements, because IMR agreed to the Amendment only on the express condition that the Artist Recordings Account and the Main JV Account would remain separate and would not be cross-collateralized, a fundamental term that 10K knowingly disregarded.

91.    As a result of 10K's False Classification, IMR was deprived of the Net Profits to which it was contractually entitled, as it resulted in the Artist Recordings Account going from a positive balance of seven hundred thirty-one thousand dollars ($731,000.00) owed to IMR to an unrecouped deficit of approximately one million two hundred sixty-eight thousand dollars ($1,268,000.00) in the 2021-2H Statement.

92.    If the Additional Profit Advance was properly applied to the Main JV Account on the 2021-2H statement, IMR would have fully recouped under the Main JV Account and become entitled to substantial profit participation at that time.

93.    Upon information and belief 10K knew this and purposefully moved the Additional Profit Advance to the Artist Recordings Account so that 10K would not have to pay IMR the Net Profits that were due at that time.

94.    Upon information and belief, 10K intentionally moved the Additional Profit Advance from the Artist Recordings Account without notice or approval from IMR to evade paying IMR's earned share of Net Profits.

95.    To date, 10K has not corrected the False Classification.

96.     Each subsequent semi-annual statement from the 2021-2H Statement to the present that has actually been rendered (collectively, the "Statements") reflects the continued improper recoupment of the Additional Profit Advance from the Artist Recordings Account.

97.     Moreover, 10K continued incurring tens of millions of dollars in Deductions each period, many of which, upon information and belief, were incurred without IMR's approval, although as set forth above as the subsequent statements also failed to include an itemized breakdown of those Deductions, IMR has been unable to determine the nature, purpose, or legitimacy of the amounts charged or whether they have been approved.

98.     Upon information and belief, as a result of the False Classification and 10K's unauthorized spending, 10K has deprived IMR of the Net Profits to which it is contractually entitled.

99.     Upon information and belief, as part of or subsequent to the Warner Purchase 10K assigned all rights and obligations under the Agreements to 10k Holdings and/or the Warner Parties.

100.   Upon information and belief, beginning with the statement for the period ending in ending June of 2024 the Warner Parties and 10K Holdings assumed the accounting and payment obligations owed to IMR.

101.   Specifically, the statements for the periods ending June of 2024 and December of 2024 were rendered by 10K Holdings and payments have been made by WMG.

102.   Additionally, in violation of the Agreements, neither the Warner Parties nor the 10K Parties have produced any accounting statements for 2025, however, consistent with 10K's disregard for 10K's contractual obligations, to date they continue to intentionally and willfully disregard their obligations and as of this writing have refused and failed to account for the most recent 2025 period.

103.   For the Statements that were actually rendered, IMR has objected to those Statements for the foregoing reasons and IMR reserves its rights to object to future statements when received.

104.   IMR has also repeatedly asked for additional information, and 10K has refused and failed to send same.

105.   In addition, on September 20, 2024, IMR timely served a formal audit demand for all Statements from June 30, 2021 through December 31, 2023 on 10K and WMG.

106.   IMR through its auditors have followed up numerous times in writing seeking to commence the audit.

107.   The Warner Parties who have claimed to assume responsibility for the audit, have advised in writing that they cannot not allow the audit because 10K and Grainge have failed to provide them with all reports of Gross Revenue and Deductions needed to commence the audit.

108.   Notwithstanding IMR's written objections and formal audit demand, the Defendants have failed to produce any underlying documentation for the Deductions and Gross Revenues, failed to allow an audit and has failed to correct the False Classification.

109.   Defendants' continuing failure to cure the False Classification of the Additional Profit Advance and the unapproved Deductions has deprived IMR of substantial Net Profits that would have been payable.

110.   10K also made numerous material business decisions without IMR's required approval that further deprived IMR of profits that it is entitled to.

111.   For example, without obtaining IMR's approval, 10K allocated fifty percent (50%) of the Net Profits from the Artist's hit song "Lemonade", which had four (4) artists on the song, to one (1) featured artist, thereby diluting and effectively giving away IMR's bargained-for profit participation on the JV and Artist side.

112. On or around May 25, 2021, IMR raised the issue with 10K, Grainge and 10K's representative Danielle Price ("Price"),  advising 10K that the decision had been made without the required approval and had improperly diverted Net Profits otherwise payable to IMR.

113. Grainge stated to IMR on the phone that 10K would pay those improperly diverted Net Profits from 10K's share.

114. On June 1, 2021, 10K's representative Danielle Price ("Price") confirmed via email that "Elliot has agreed that 10K will pay all of the net profits to Republic on Nav/Lemonade directly from 10K's share".

115. It was again confirmed by Blake Brown of 10K that 10K agreed to pay all of the Net Profits to Republic directly from 10K's share.

116. Notwithstanding that representation, upon information and belief, 10K failed and refused to do so.

117. In addition, 10K paid an advance to another artist who was a Label Artist to create an album in the amount of five hundred thousand dollars ($500,000.00) and renegotiated that artist's recording agreement without notice to or approval from IMR.

118. IMR did not approve the advance, was not even consulted about said advance and indeed, only learned of the advance to the other artist through that artist's manager.

119. 10K also failed to execute a profit participation agreement with Taz with respect to iann dior, nor has it accounted to Taz for same on a semi-annual basis pursuant to the express terms of the Label Agreement.

120. As a result of the foregoing breaches, IMR cannot ascertain the full Net Profits to which it is entitled or the extent to which improper charges have diminished IMR's profit participation.

121. Taken together, the foregoing breaches demonstrate a consistent and willful pattern of misconduct by 10K designed, on information and belief, to deprive IMR of its rightful profit participation under the Agreements.

122.   Upon information and belief, as a direct and proximate result of the Breaches, IMR has been denied millions of dollars in Net Profits to which it is entitled and continues to suffer ongoing damages due to 10K's intentional misreporting and bad-faith conduct.

## FIRST CAUSE OF ACTION

### Breach of Contract – JV Agreements (IMR against 10K, 10K Holdings and the Warner Parties)

123.   Plaintiffs repeat and re-allege all the allegations set forth in Paragraphs 1-122 of the Complaint.

124.   The Agreements are valid and enforceable written contracts that govern and define the rights and obligations of IMR and 10K with respect to the JV.

125.   IMR fully performed its obligations under the Agreements by rendering talent finding/scouting services and record executive services exclusively to 10K.

126.   10K, however, during the Term of the Agreements and thereafter, engaged in a consistent and repeated pattern of violations and breaches of its obligations under the Agreements in numerous ways.

127.   10K had various obligations under the Agreements, including but not limited to its obligations to:

        a.   Pay IMR its fifty percent (50%) share of Net Profits earned under the Label Agreement;

        b.   Recoup both Profit Advances paid to IMR from IMR's 50% share of the Net Profits from the Main JV Account;

        c.   Issue semi-annual accountings to IMR with standard audit rights;

        d.   Deduct only actual, direct, verifiable out-of-pocket third party costs and expenses paid for or incurred by 10K in connection with Artist Agreements;

        e.   Obtain IMR's approval for creative-decision making with respect to all Label Artists;

f. With respect to Label Artists, obtain IMR's approval for: (i) recording budgets/funds; (ii) for each recording project, the initial marketing plan and any material deviations therefrom and budget therefore; and (iii) "all other business decisions";

g. Obtain IMR's approval for any reallocation of the A&R Recording Costs/Marketing Fund;

h. Obtain IMR's approval for any Label Artists being signed and the terms of the Artist Agreements; and

i. Negotiate with IMR in good faith in the event that 10K entered into a similar agreement with another producer signed to IMR or Taz (or an entity wholly owned by IMR or Taz) (collectively, 10K's "Obligations").

128.    Upon information and belief, 10K made additional material business and financial decisions requiring IMR's prior approval under the Agreements without obtaining such approval.

129.    However, because 10K failed to provide IMR with transparency into its underlying agreements with third-parties, Deductions and Gross Revenue and complete accounting records as they were required to do, IMR presently lacks full visibility into the scope and number of such unauthorized decisions and therefore cannot identify all instances of noncompliance until a complete accounting and audit are conducted.

130.    Upon information and belief based on the information presently available to IMR, 10K materially breached the Agreements by: (i) disregarding IMR's contractual approval rights and failing to obtain IMR's approval for material business decisions, including but not limited to allocating fifty percent (50%) of profits from the Artist's hit song "Lemonade" to another featured artist and issuing a five hundred thousand dollar ($500,000.00) advance to another Label Artist for an album project; (ii) unilaterally incurring and allocating millions of dollars in Deductions to the Artist

Recording Account and the Main JV Account without IMR's approval; (iii) failing and refusing to provide IMR with a full and accurate accounting of those Deductions and Gross Revenues; (iv) reclassifying and transferring the Additional Profit Advance from the Main JV Account to the Artist Recordings Account; (v) failing to pay IMR its fifty percent (50%) share of Net Profits; and (vi) failing to account to IMR for the first half of 2025 (collectively, 10K's "Breaches").

131.   Upon information and belief, had the Additional Profit Advance remained applied to the Main JV Account on the 2021-2H statement, IMR would have fully recouped under the Main JV Account and become entitled to substantial profit participation at that time and substantially higher profit participation thereafter.

132.   The Statements reflect the ongoing application of the Additional Profit Advance to the Artist Recordings Account.

133.   Each Statement also reflects increasing Deductions each period, many of which, upon information and belief, were incurred without IMR's approval.

134.   Upon information and belief, but for 10K's Breaches, IMR would otherwise have recouped under the JV and been entitled to substantially higher profit participation.

135.   As a direct and proximate result of 10K's Breaches, IMR has suffered damages in an amount to be proven at trial, but no less than four million dollars ($4,000,000.00), plus interest, costs, disbursements and all other relief the Court deems just and proper.

## SECOND CAUSE OF ACTION

### Accounting (IMR against 10K, 10K Holdings and the Warner Parties)

136.   Plaintiffs repeat and re-allege all the allegations set forth in Paragraphs 1-135 of the Complaint.

137.   A relationship requiring an accounting exists between IMR, on the one hand, and the Warner Parties and 10K Holdings, on the other, because, upon information and belief, through the Warner Purchase the Warner Parties and/or 10K

Holdings assumed the accounting and payment obligations owed to IMR pursuant to the Agreements, including but not limited to the obligations to render semi-annual accountings to IMR with standard audit rights.

138.    Upon information and belief, beginning with the statement for the period ending in ending June of 2024 the Warner Parties and 10K Holdings assumed the accounting and payment obligations owed to IMR.

139.    Specifically, the statements for the periods ending June of 2024 and December of 2024 were rendered by 10K Holdings and payments have been made by WMG.

140.    In breach of the Agreements, neither the Warner Parties, 10K nor 10K Holdings have produced any accounting statements for 2025.

141.    Additionally, prior Statements have been incomplete, non-itemized, contained falsely classified Deductions and are unsupported by documentation, rendering IMR unable to verify any reported figures or determine the true balance owed to IMR.

142.    As such, on September 20, 2024, IMR also served a formal audit demand for all Statements from June 30, 2021 through December 31, 2023 on 10K and WMG.

143.    To date, the Warner Parties, 10K and 10K Holdings have failed to allow IMR to conduct a proper audit and have failed to render complete accounting statements reflecting the underlying Gross Revenues and Deductions for payments being issued to IMR thereunder.

144.    The precise amount due to IMR cannot be ascertained without a full accounting of all Gross Revenues and Deductions related to the Agreements.

145.    Upon information and belief, the information necessary to calculate such amounts lies exclusively within the possession, custody, and control of the Warner Parties and 10K Holdings and/or the 10K Parties.

146.    Accordingly, IMR seeks an order compelling the Warner Parties and 10K Parties to render a full and complete accounting and payment of all Gross Revenues

and Deductions relating to the JV and payment of all sums found to be due and owing to IMR, together with such other and further relief as the Court deems just and proper.

## THIRD CAUSE OF ACTION

### Breach of Fiduciary Duty (IMR against 10K, 10K Holdings and the Warner Parties)

147.   Plaintiffs repeat and re-allege all the allegations set forth in Paragraphs 1-146 of the Complaint.

148.   At all relevant times, IMR and 10K were engaged in a joint venture pursuant to the Agreements.

149.   As fiduciaries, 10K and its officers and agents were required to deal honestly and transparently with IMR and to refrain from self-dealing.

150.   Upon information and belief, 10K breached its fiduciary duties under the Agreements by (i) failing to disclose and obtain IMR's approval for material business and financial decisions; (ii) unilaterally incurring and charging tens of millions of dollars in Deductions to the Artist Recording Account and Main JV Account without IMR's knowledge or authorization; (iii) abusing its position of control over the JV's finances and records by failing to render full and accurate accountings and concealing material financial information from IMR; (iv) falsely classifying and transferring the Additional Profit Advance from the Main JV Account to the Artist Recording Account, to IMR's detriment and for 10K's benefit; and (iv) withholding Net Profits owed to IMR.

151.   Upon information and belief, 10K's conduct was willful, oppressive, and in conscious disregard of IMR's rights.

152.   If the Additional Profit Advance was properly applied to the Main JV Account on the 2021-2H statement, IMR would have fully recouped under the Main JV Account at that time and become entitled to substantially more profit participation thereafter.

153.    Upon information and belief, 10K intentionally moved the Additional Profit Advance from the Artist Recordings Account without notice or approval from IMR to avoid paying IMR's earned share of Net Profits.

154.    10K's actions exceeded mere contractual nonperformance and constituted breaches of 10K's fiduciary obligations of honesty, transparency, and fair dealing.

155.    As a direct and proximate result of 10K's breaches of fiduciary duties, IMR has suffered damages in an amount to be determined at trial, plus interest, costs and disbursements.

156.    10K should also be required to pay punitive damages to punish it for breaching its fiduciary duties in an amount to be determined at trial but no less than one million dollars ($1,000,000.00), in order to deter them and others similarly situated from engaging in such conduct in the future.

## FOURTH CAUSE OF ACTION

**Breach of Contract – Publishing JV Agreement (Taz Taylor Beats against 10K Parties)**

157.    Plaintiffs repeat and re-allege all the allegations set forth in Paragraphs 1-156 of the Complaint.

158.    Prior to entering the JV, Taz had discovered and signed several successful songwriters to exclusive co-publishing and administration agreements with his publishing company, Taz Taylor Beats, including writers Kim Candilora II p/k/a "KC Supreme" and Dorien Robert Marchand Theus p/k/a "DT" f/k/a "Sidepce".

159.    Under Taz Taylor Beats' agreements with KC Supreme (the "KC Supreme Agreement") and Sidepce (the "Sidepce Agreement"): (i) Taz Taylor Beats exclusively acquired an undivided fifty percent (50%) ownership interest in the copyrights (the "Publisher's Share") in all compositions written, owned and/or controlled by KC Supreme and Sidepce (the "KC Supreme Compositions" and the "Sidepce Compositions," respectively); (ii) pursuant to the KC Supreme Agreement

and Sidepce Agreement, KC Supreme and Sidepce respectively retained the remaining fifty perfect (50%) ownership interest in the copyrights in all KC Supreme and Sidepce Compositions; and (iii) Taz Taylor Beats retained the one hundred percent (100%) exclusive administration rights in same.

160.   In or around November of 2019, around the time KC Supreme and Sidepce began gaining significant commercial success, Grainge expressed to Taz his strong interest in bringing those writers to the 10K Parties.

161.   Taz  was only willing to do so on the condition that he would bring KC Supreme and Sidepce, who were signed to Taz Taylor Beats, to the 10K Parties through a joint publishing venture between Taz Taylor Beats and the 10K Parties, wherein: (i) Taz Taylor Beats would maintain  fifty percent (50%) of its Publisher's Share that it was already entitled to under the KC Supreme Agreement and Sidepce Agreement, and the fifty percent (50%) so-called net publisher's share ("NPS") derived therefrom, with the other fifty percent (50%) of the Publisher's Share going to the 10K Parties, and (ii) would share 50/50 with the 10K Parties in ownership of the Publisher's Share of any subsequent compositions for writers that Taz discovered and presented to the 10K Parties to be brought into the joint publishing venture, and share 50/50 of the NPS derived from same with the 10K Parties (the "Publishing JV").

162.   This structure whereby 10K and Taz Taylor Beats each individually owning one-half of the Publisher's Share and the NPS derived therefrom is entirely consistent with the original JV that the parties' affiliated entities were operating under at the time and was consistent with industry custom and practice for a publishing joint venture

163.   Grainge loved the idea and was eager to move forward.

164.   The parties' agreement to establish the Publishing JV as described herein is referred to as the "Publishing JV Agreement".

165.   On November 19, 2019, Desir texted Grainge and Taz in a group chat (the "November 19th Group Chat"), stating he was "[t]rying to move forward with what we spoke about Friday", referring to the November 2019 Call.

166.   Taz responded by stating that KC Supreme and Sidepce, in addition to other writers, "[a]ll deserve pub[lishing] deals", to which Grainge responded "[w]ill get those out this week", adding that he would "get it rolling now…[l]ets go…IMP…[y]ou'll have the drafts to hand out songwriters and producers on first look".

167.   Upon information and belief, "IMP" as used by Grainge in the November 19th Group Chat referred to "Internet Money Publishing", referring to a publishing JV between the parties.

168.   Upon information and belief, the "drafts to hand out" referenced by Grainge in the November 19th 2019 Group Chat were drafts of the publishing agreements for the writers identified by Taz.

169.   Grainge was aware at the time of the Publishing JV Agreement that KC Supreme and Sidepce were then currently signed to exclusive co-publishing and administration agreements solely with Taz Taylor Beats because the parties had previously discussed Taz Taylor Beats' agreements with those writers and the ownership and administration rights granted to Taz Taylor Beats pursuant to same.

170.   In reliance on Grainge's oral and written representations that Taz Taylor Beats would share 50/50 in copyright ownership of the Publisher's Share and 50/50 in profits derived therefrom under the Publishing JV, Taz permitted KC Supreme and Sidepce to become part of the Publishing JV.

171.   On November 21, 2019, in furtherance of the Publishing JV Agreement, Desir texted Grainge and Taz in a group chat (the "November 21st Group Chat"), and, addressing Grainge, stated, "Elliot we need to send a deal out to Kc supreme ASAP", to which Grainge responded, "We're sending it out".

172.    The next day, counsel for the 10K Parties emailed Taz, Desir and counsel for Taz Taylor Beats with a draft publishing agreement for KC Supreme and 10K.

173.    When counsel for Taz Taylor Beats asked questions about the draft, Grainge responded on November 25, 2019, instructing the 10K Parties' attorney to "explain the structure to [Taz Taylor Beats'] attorney" and acknowledged that the deal with KC Supreme was coming "[t]hrough IM", i.e. through Taz Taylor Beats.

174.    Upon information and belief, 10K signed an agreement with KC Supreme on or around November 20, 2019 (the "10K-KC Supreme Agreement").

175.    On January 13, 2020, Desir sent Grainge a text message stating, "I remember you spoke to taz and I about doing a big 7 figure admin deal", and asked, "is that still on the table?"

176.    Grainge replied to Desir's January 13th text message stating, "100000%", and, "We'll sort Taz out with admin deal that's easy…[a]nd we're already set up w the JV. It's all about taz building up his catalogue…[y]ou guys know the drill !" (the "January 13th Texts").

177.    Grainge's statement that "It's all about taz building up his catalogue" is a reference to building copyright ownership in composition rights through the Publishing JV Agreement by bringing in more songwriters to the Publishing JV.

178.    Grainge's January 13th Texts further induced Taz Taylor Beats' reasonable reliance on the terms of the Publishing JV Agreement, and as a result Taz Taylor Beats continued to perform thereunder and brought more writers to be signed under the Publishing JV.

179.    Grainge's January 13th Texts also further induced Taz Taylor Beats' consent to Sidepce becoming part of the Publishing JV.

180.    In February 2022, Taz also agreed to bring another writer, Javier Mercado p/k/a "Synthetic" ("Synthetic"), to the Publishing JV.

181.    Synthetic, however, was on the verge of signing a publishing deal with a third party.

182.    Taz told Grainge that he thought he could convince Synthetic to sign with them under the Publishing JV and proposed that they do a deal with Synthetic under the Publishing JV Agreement, and Grainge agreed to do so.

183.    On February 22, 2022, Grainge acted on his agreement with Taz's proposal via email saying, "[l]ets get an offer out!", referring to Synthetic.

184.    That same day, representatives of 10K sent an email to Desir and Taz requesting information needed to draft the Synthetic offer on behalf of the Publishing JV.

185.    Taz responded to 10K and stated that Synthetic "has a few deals on the table and I'm trying to close this asap."

186.    Later on February 22, 2022, Price emailed Taz a draft proposal of the Synthetic deal—not Taz's counsel— and asked for Taz's feedback.

187.    Taz provided feedback and exchanged emails back and forth with Price discussing whether Taz agreed with certain terms of the Synthetic deal.

188.    Specifically, on February 23, 2022, when Synthetic's team provided comments on the deal proposal, Price then emailed a proposed counter-reply to Taz and sought Taz's approval for same as a representative of Taz Taylor Beats, one of the JV partners, without Taz Taylor Beats' counsel on copy.

189.    Price followed up with Taz that same day stating, "Just checking back in. OK to send our reply per my note below?  Any questions?".

190.    Later that same day, Taz, on behalf of Taz Taylor Beats, one of the Publishing JV partners, responded with his approval to the counter-reply, and Price responded, "Great. This is out!".

191.    Again on February 24, 2022, Synthetic provided comments on the counter-reply, and Price sought Taz's approval, again as a representative of Taz Taylor Beats, one of the Publishing JV partners, before sending a response.

192.    10K representatives emailed Taz later on February 24, 2022 stating that the deal was closed and they were preparing the long form agreement.

193.   10K representatives also emailed Taz on March 1, 2022 to provide an update on the status of the long form agreement, stating that it had been sent over to Synthetic's lawyer.

194.   On March 21, 2022, 10K representatives again emailed Taz stating, "Hey 10K & [Taz] – We have closed and have a partially executed agreement. It is circulating for complete execution shortly. Congrats!", although the agreement itself was not provided to Taz or the Plaintiffs, despite requests for same.

195.   Taz proposal to get Synthetic to the Publishing JV in reliance on Grainge's and the 10K Parties' oral and written representations that Taz Taylor Beats would share in the copyright ownership and NPS from the deal pursuant to the terms of the Publishing JV Agreement.

196.   But for Grainge's oral and written representations, Taz Taylor Beats would not have agreed to Synthetic becoming part of the Publishing JV.

197.   The 10K Parties' actions of seeking Taz's approval for the Synthetic deal terms and congratulating him on the closing of same further reinforced his reasonable belief that Synthetic had been signed pursuant to the Publishing JV Agreement, for the parties' joint benefit.

198.   Since the 10K Parties signed the publishing agreements with KC Supreme, Sidepce and Synthetic (collectively, the "Writers"), the 10K Parties have never accounted to Taz Taylor Beats or paid Taz Taylor Beats its share of royalties derived from those agreements.

199.   Through these actions, the 10K Parties retained all monies and rights while excluding Taz Taylor Beats from the benefits of the very deals it originated and facilitated.

200.   Taz Taylor Beats followed up multiple times, and was always led to believe that the 10K Parties would provide the required accountings, payments and would otherwise perform, including by providing Taz Taylor Beats with its fifty percent (50%) of the Publisher's Share of the composition copyrights.

201.   On February 2, 2023, 10K Parties' legal counsel responded to Desir, expressly acknowledging the "profit split with IM/Taz for these writers", referring to KC Supreme, Sidepce and Synthetic. Desir was referring to the fifty percent (50%) of the Publisher's Share of the composition copyrights and resulting fifty percent (50%) NPS that would result from same.

202.   In that same email, the 10K Parties' legal counsel attached a draft Profit Participation Agreement as to the Writers, stating that he "drafted some paperwork so we can memorialize the deal so it's no longer a handshake, but we've got it inked" and he was "doing [his] best to clean and wrap this up to ensure we're all moving forward as a productive partnership."

203.   However, the draft Profit Participation Agreement that the 10K Parties produced did not reflect what the parties agreed to in discussions, texts and other communications the parties had with one another and was not consistent with Publishing JV Agreement and the parties' prior course of dealing.

204.   Rather than reflecting the terms that were agreed to as to these Writers pursuant to the Publishing JV Agreement, the draft Profit Participation Agreement only offered Taz Taylor Beats a passive income interest and attempted to disgorge him of any copyright ownership or administration rights.

205.   Taz Taylor Beats promptly raised this issue, and the 10K Parties continued to represent that the draft Profit Participation Agreement would be revised to reflect the terms of the Publishing JV Agreement.

206.   Indeed, the 10K attorney who drafted the Profit Participation Agreement acknowledged that he was not originally aware of the deal terms that were originally agreed to and that the draft would be revised.

207.   On or around January 18, 2024, Desir sent a text message to the 10K Parties' legal counsel questioning when IMR would be receiving overhead payment because two (2) payments were past due, and that no future deals between 10K and Taz Taylor Beats could move forward "until all our past due obligations are met and

cleared. Overhead up to date and Taz / Elliot profit participation for the producers he got signed (think it's 3 or 4 of them) and 10K papered and finally finalized", referring to the formalization of the Writers becoming part of the Publishing JV.

208.   The 10K Parties' legal counsel responded stating, "Okay let me talk to everyone today" and sent a "handshake" emoji (the "January 2024 Texts"), further inducing Taz Taylor Beats' reliance that the 10K Parties were performing under the Publishing JV Agreement.

209.   Despite these representations, the 10K Parties never revised the draft, and never executed any formal agreement and have continued to fail to assign fifty percent (50%) of the Publisher's Share of Synthetic compositions and account and or pay Taz Taylor Beats in accordance with the Publishing JV Agreement.

210.   As a direct and proximate result of the 10K Parties' misrepresentations, Taz Taylor Beats has been denied the profits from the Publishing JV Agreement as well as its fifty percent (50%) of the Publisher's Share of Synthetic compositions.

211.   As a direct result of the 10K Parties' breaches and misconduct, Taz Taylor Beats has suffered millions of dollars in damages, and continues to suffer ongoing harm.

212.   As a direct and proximate result of the 10K Parties' breaches of the Publishing JV Agreement, Taz Taylor Beats has been damaged and deprived of those copyright interests and entitlements otherwise due to Taz Taylor Beats pursuant to the Publishing JV as it has lost the profit it is entitled to from the Publishing JV Agreement as well as the assignment of Taz Taylor Beats shared ownership with 10K Publishing in the Synthetic composition copyrights.

213.   As a result of the 10K Parties' conduct, Taz Taylor Beats has sustained damages in an amount to be determined at trial, plus interest, costs and disbursements, an order conveying fifty percent (50%) of the Publisher's Share of Synthetic's compositions to Taz Taylor Beats and all other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION

**Promissory Estoppel (Taz Taylor Beats against 10K Parties)**

214.    Plaintiffs repeat and re-allege all allegations set forth in Paragraphs 1-213 of the Complaint.

215.    Beginning in November 2019 and continuing through February 2022, Elliot Grainge and other representatives of the 10K Parties made clear and unambiguous oral and written representations to Taz Taylor Beats that Taz Taylor Beats would share in the copyright ownership and NPS from the deal pursuant to the terms of the Publishing JV Agreement.

216.    These promises were made verbally on the November 2019 Call, in the November 19 and November 21 Group Chats, and in the January 13, 2020 Texts, and on multiple other telephone calls.

217.    Grainge was aware at the time of the Publishing JV Agreement that KC Supreme and Sidepce were then-signed to Taz Taylor Beats because the parties had discussed Taz Taylor Beats' agreements with those artists and the ownership rights granted to Taz Taylor Beats pursuant to same.

218.    In reliance on Grainge's representations, Taz Taylor Beats permitted KC Supreme and Sidepce to become part of the Publishing JV and brought Synthetic into the Publishing JV.

219.    The 10K Parties' misrepresentations were made under circumstances that rendered Taz's reliance both reasonable and plainly foreseeable, as the 10K Parties— through their CEO, Grainge, and other principals—made those representations directly to Taz Taylor Beats' principals (including Taz), included Taz in negotiations over the Writers' publishing agreements, and repeatedly sought his approval on material terms, all for the purpose of inducing reliance and creating the false impression that the 10K Parties were performing under the Publishing JV Agreement.

220.    Taz Taylor Beats' cooperation, its forbearance from enforcing its own publishing contracts with KC Supreme and Sidepce, and its assistance in securing Synthetic's signing with 10K, were all undertaken in reasonable reliance on 10K's

clear and repeated representations that Taz Taylor Beats would have reaped the benefits, rights and entitlements under the Publishing JV Agreement.

221.   Injustice can only be avoided by enforcing 10K's promises, as 10K has retained the benefits of Taz Taylor Beats' performance of the Publishing JV Agreement, i.e. publishing contracts with the Writers, and, upon information and belief, profits from same and ongoing royalties from the administration and exploitation of the Writers' Compositions, without providing Taz Taylor Beats the bargained-for consideration under the Publishing JV Agreement.

222.   As a result of the 10K Parties' conduct, Taz Taylor Beats has sustained damages in an amount to be determined at trial, plus interest, costs and disbursements, an order conveying fifty percent (50%) of the Publisher's Share of Synthetic's compositions to Taz Taylor Beats and all other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION

### In the alternative, Fraudulent Inducement (Taz Taylor Beats against the 10K Parties)

223.   Plaintiffs repeat and re-allege all allegations set forth in Paragraphs 1-222 of the Complaint.

224.   Beginning in November 2019 and continuing through 2022, Grainge, on behalf of the 10K Parties, made numerous false representations to Taz Taylor Beats, both orally and in writing, that Taz Taylor Beats would share in the copyright ownership and NPS from the deal pursuant to the terms of the Publishing JV Agreement.

225.   Upon information and belief, Grainge's representations were false when made.

226.   Upon information and belief, the 10K Parties never intended to share ownership of the Publisher's Share of the compositions or NPS with Taz Taylor Beats and instead intended to induce Taz Taylor Beats to deliver the Writers to the 10K Parties for their own exclusive benefit.

227.   Upon information and belief, the 10K Parties knew the representations were false and made them with the intent to deceive Taz Taylor Beats into delivering the Writers to 10K without adequate consideration or protection.

228.   Taz Taylor Beats reasonably relied on these representations in allowing KC Supreme and Sidepce to become part of the Publishing JV, and later in bringing Synthetic to the Publishing JV, believing that it would receive its promised fifty percent (50%) share of ownership rights in the Publisher's Share of the compositions and NPS based on continued false representations and omissions made by the 10K Parties, including but not limited to the January 13, 2020 Texts, the 10K Parties' actions of seeking Taz's approval for the Synthetic deal terms and congratulating him on the closing of same, and later the January 2024 Texts.

229.   As a direct and proximate result of the 10K Parties' misrepresentations, Taz Taylor Beats has lost the profit it is entitled to from the Publishing JV Agreement, the profits it would have otherwise collected from the exploitation and administration of the KC Supreme Compositions and the Sidepce Compositions as well as the value of the shared ownership and control with the 10K Parties in the Publisher's Share of the Synthetic composition copyrights.

230.   As a direct and proximate result, Taz Taylor Beats has sustained damages in an amount to be determined at trial, plus interest, costs and disbursements, an order conveying fifty percent (50%) of the Publisher's Share of Synthetic's compositions to Taz Taylor Beats and all other relief the Court deems just and proper..

231.   The 10K Parties should also be required to pay punitive damages to punish them for their conduct that was willful, malicious, and undertaken with conscious disregard of Taz Taylor Beats' rights, in an amount to be determined at trial but no less than one million dollars ($1,000,000.00), in order to deter them and others similarly situated from engaging in such conduct in the future.

## SEVENTH CAUSE OF ACTION

**In the alternative, Unjust Enrichment (Taz Taylor Beats against 10K Parties)**

232.   Plaintiffs repeat and re-allege all allegations set forth in Paragraphs 1-231 of the Complaint.

233.   To the extent the Court finds that no enforceable contract or promise governs Taz Taylor Beats and the 10K Parties' relationship concerning the publishing agreements as to the Writers under the Publishing JV, equity demands that the 10K Parties not be permitted to retain the benefits conferred by Taz Taylor Beats.

234.   Taz Taylor Beats has existing exclusive co-publishing and administration contracts with KC Supreme and Sidepce and permitted KC Supreme, Sidepce and Synthetic to work with the 10K Parties, and contributed substantial time and effort to secure and finalize the Writers' deals with the 10K Parties.

235.   Upon information and belief, through Taz Taylor Beats' actions, the 10K Parties received and retained significant benefits, including but not limited to the ownership of the Publisher's Share of Synthetic compositions, the benefits from the exploitation of the Writers' Compositions, including all revenues and royalties derived therefrom.

236.   The foregoing benefits were conferred upon the 10K Parties as a direct result of Taz Taylor Beats' efforts as well as its preexisting contractual relationship with KC Supreme and Sidepce.

237.   The 10K Parties' retention of those benefits is unjust because they were obtained through misrepresentations and inequitable conduct that induced Taz Taylor Beats consent to the Writers becoming part of the Publishing JV under the belief that it would share in the copyright ownership and NPS from the deal pursuant to the terms of the Publishing JV Agreement.

238.   Equity and good conscience therefore require that the 10K Parties restore to Taz Taylor Beats the value of the benefits wrongfully retained, including all royalties, revenue and other consideration derived from the publishing agreements with KC Supreme, Sidepce and Synthetic.

239.   As a direct and proximate result of the 10K Parties' unjust enrichment, Taz Taylor Beats has been deprived of the ownership and administration rights it earned and has suffered damages in an amount to be proven at trial, plus interest, costs, disbursements and such other relief as the Court deems just and proper.

## EIGHTH CAUSE OF ACTION

### Accounting (Taz Taylor Beats against the 10K Parties)

240.   Plaintiffs repeat and re-allege all allegations set forth in Paragraphs 1-239 of the Complaint.

241.   A fiduciary and contractual relationship exists between Taz Taylor Beats and the 10K Parties by virtue of the Publishing JV Agreement.

242.   Upon information and belief, the 10K Parties have wrongfully retained one-hundred percent (100%) of the revenues derived from the Writers' publishing agreements with the 10K Parties and failed to assign or credit Taz Taylor Beats with respect to the Synthetic compositions.

243.   As of the filing of this Complaint, the 10K Parties have failed to provide any accounting of royalties or other revenues derived from the Writers' Compositions and related rights under their the 10K Parties' publishing agreements with the Writers.

244.   Upon information and belief, the 10K Parties have exclusive control of the financial records, account statements and publishing income streams at issue, and therefore the balance due to Taz Taylor Beats cannot be ascertained without a full and proper accounting.

245.   Taz Taylor Beats therefore seeks an order compelling the 10K Parties to render a full and accurate accounting of all income, profits, royalties and expenses relating to the Writers' Compositions and to pay any amounts found due, together with interest and such other relief as the Court deems just and proper.

## NINTH CAUSE OF ACTION

### Breach of Fiduciary Duty (Taz Taylor Beats against the 10K Parties)

246.   Plaintiffs repeat and re-allege all allegations set forth in Paragraphs 1-245 of the Complaint.

247.   Pursuant to entering into the Publishing JV and Publishing JV Agreement, and the affiliated entities being in the JV, the 10K Parties owed fiduciary duties to Taz Taylor Beats.

248.   The 10K Parties breached their fiduciary duties to Taz Taylor Beats by acting in their own self interest as set forth above.

249.   Upon information and belief, the 10K Parties' conduct was willful, oppressive, and in conscious disregard of Taz Taylor Beats' rights.

250.   The 10K Parties' actions exceeded mere contractual nonperformance and constituted breaches of the 10K Parties' fiduciary obligations of honesty, transparency, and fair dealing.

251.   As a direct and proximate result of the 10K Parties' breaches of fiduciary duties, Taz Taylor Beats has suffered damages in an amount to be determined at trial, plus interest, costs, disbursements and attorneys' fees.

252.   The 10K Parties should also be required to pay punitive damages to punish it for breaching its fiduciary duties in an amount to be determined at trial but no less than one million dollars ($1,000,000.00), in order to deter them and others similarly situated from engaging in such conduct in the future.

## TENTH CAUSE OF ACTION

### Declaratory Judgment (Taz Taylor Beats against the 10K Parties)

253.   Plaintiffs repeat and re-allege all allegations set forth in Paragraph 1-252 of the Complaint.

254.   An actual and substantial controversy exists between Taz Taylor Beats, on the one hand, and the 10K Parties, on the other hand, concerning the ownership and administration rights in the KC Supreme Compositions and the Sidepce Compositions.

255.   Under Taz Taylor Beats' agreements with KC Supreme (the "KC Supreme Agreement") and Sidepce (the "Sidepce Agreement"): (i) Taz Taylor Beats

exclusively acquired an undivided fifty percent (50%) ownership interest in the copyrights (the "Publisher's Share") in all compositions written, owned and/or controlled by KC Supreme and Sidepce (the "KC Supreme Compositions" and the "Sidepce Compositions," respectively); (ii) pursuant to the KC Supreme Agreement and Sidepce Agreement, KC Supreme and Sidepce respectively retained the remaining fifty perfect (50%) ownership interest in the copyrights in all KC Supreme and Sidepce Compositions; and (iii) Taz Taylor Beats retained the one hundred percent (100%) exclusive administration rights in same.

256.    Those ownership and administration rights were never assigned, licensed, conveyed or otherwise transferred by Taz Taylor Beats to any of the 10K Parties.

257.    Nonetheless, the 10K Parties have claimed and exercised ownership and administrative control over the KC Supreme and Sidepce Compositions, excluding Taz Taylor Beats from participation in the copyrights, administration and royalties derived therefrom and asserting that Taz Taylor Beats has no continuing ownership or administration rights.

258.    As set forth above, Taz was only willing to allow KC Supreme and Sidepce to become part of the Publishing JV pursuant to the terms of the Publishing JV Agreement, which the 10K Parties have not complied with.

259.    As such, a substantial and actual controversy therefore exists between the parties, as Taz Taylor Beats remains the rightful owner of a fifty percent (50%) ownership interest in the KC Supreme and Sidepce Compositions and the exclusive administrator of one hundred percent (100%) of those Compositions, while the 10K Parties have also asserted those rights.

260.    This dispute is of sufficient immediacy and reality to warrant issuance of a declaratory judgment, as upon information and belief the 10K Parties continue to exploit, administer and collect royalties from the KC Supreme and Sidepce Compositions while excluding Taz Taylor Beats.

261.    Accordingly, Taz Taylor Beats seeks a judicial declaration that:

a. Taz Taylor Beats owns an undivided fifty percent (50%) ownership interest in the Publisher's Share of the copyrights in the KC Supreme and Sidepce Compositions;

b. Taz Taylor Beats continues to retain one hundred percent (100%) of the exclusive administration rights in and to the KC Supreme and Sidepce Compositions (including but not limited to the Publisher's Share and Writer's Share thereof);

c. Taz Taylor Beats' ownership and administration rights in the KC Supreme and Sidepce Compositions were never assigned, licensed or transferred to any of the 10K Parties; and

d. The 10K Parties have no right to claim, exploit or exercise ownership or administration rights in the KC Supreme and Sidepce Compositions adverse to Taz Taylor Beats.

262.   Taz Taylor Beats further seeks such other and further relief as the Court deems just and proper.

## **PRAYER**

**WHEREFORE**, Plaintiffs respectfully demand judgment as follows:

a)  That on the first cause of action, the Court enter damages in an amount to be proven at trial, but no less than four million dollars ($4,000,000.00), plus interest, costs and disbursements;

b)  That on the second cause of action, the Court enter an Order compelling the Warner Parties and 10K Parties to render a full and complete accounting and payment of all Gross Revenues and Deductions relating to the JV and payment of all sums found to be due and owing to IMR;

c)  That on the third cause of action, the Court enter damages in an amount to be determined at trial, plus interest, costs, disbursements and punitive damages;

d)  That on the fourth cause of action, the Court enter damages in an amount to be determined at trial, plus interest, costs and disbursements, and an order conveying fifty percent (50%) of the Publisher's Share of Synthetic's compositions to Taz Taylor Beats;

e)  That on the fifth cause of action, the Court enter damages in an amount to be determined at trial, plus interest, costs and disbursements, and an order conveying fifty percent (50%) of the Publisher's Share of Synthetic's compositions to Taz Taylor Beats;

f)  That on the sixth cause of action, the Court enter damages in an amount to be determined at trial, plus interest, costs and disbursements, punitive damages and an order conveying fifty percent (50%) of the Publisher's Share of Synthetic's compositions to Taz Taylor Beats;

g)  That on the seventh cause of action, the Court enter damages in an amount to be proven at trial, plus interest, costs and disbursements;

h)  That on the eighth cause of action, the Court enter an order compelling the 10K Parties to render a full and accurate accounting of all income, profits, royalties and expenses relating to the Writers' Compositions and to pay any amounts found due, together with interest;

i)  On the ninth cause of action, the Court enter damages in an amount to be determined at trial, plus interest, costs, disbursements and punitive damages;

j)  On the tenth cause of action, the Court enter an judicial determination that:

  i.  Taz Taylor Beats owns an undivided fifty percent (50%) ownership interest in the Publisher's Share of the copyrights in the KC Supreme and Sidepce Compositions;

  ii. Taz Taylor Beats continues to retain one hundred percent (100%) of the exclusive administration rights in and to the KC Supreme and

Sidepce Compositions (including but not limited to the Publisher's Share and Writer's Share thereof);

iii.    Taz Taylor Beats' ownership and administration rights in the KC Supreme and Sidepce Compositions were never assigned, licensed or transferred to any of the 10K Parties; and

iv.    The 10K Parties have no right to claim, exploit or exercise ownership or administration rights in the KC Supreme and Sidepce Compositions adverse to Taz Taylor Beats;

k) For judgment for interest and costs of suit and for such relief as is fair, just, and equitable; and

l)  For any such further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial on all issues so triable.

Dated:    November 4, 2025

Respectfully submitted,

ADELMAN MATZ P.C.

By: /s/ Sarah M. Matz
Sarah M. Matz, Esq. (SBN 312051)
1645 North Vine Street, Suite 809
Los Angeles, California 90028
Tel: (646) 650-2207
E-Mail: sarah@adelmanmatz.com

*Attorneys for Plaintiffs Internet Money Records, LLC and Taz Taylor Beats, LLC*