**O**

# United States District Court
# Central District of California

INTERNET MONEY RECORDS, LLC et al.,

Plaintiffs,

v.

TENTHOUSAND PROJECTS, LLC et al.,

Defendants.

Case № 2:25-cv-10614-ODW (ASx)

**ORDER ON DEFENDANTS'
MOTIONS TO DISMISS [30] [32]**

## I.    INTRODUCTION

Plaintiffs Internet Money Records, LLC ("IMR") and Taz Taylor Beats, LLC ("TTB") filed this breach of contract action against Defendants TenThousand Projects, LLC ("10K"); TenThousand Music Publishing, LLC ("10K Publishing"); TenThousand Projects Holdings, LLC ("10K Holdings"); Warner Music Group Corp.; and Warner Music Inc. (collectively, "Warner").  (Compl., Dkt. No. 1.)  Defendants 10K Holdings and Warner now move to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6).  (10K Holdings & Warner Mot. Dismiss ("10K-H/W MTD"), Dkt. No. 30.)  Defendants 10K and 10K Publishing separately move to dismiss under Rule 12(b)(6).  (10K & 10K Publishing Mot. Dismiss ("10K MTD"), Dkt. No. 32.)  For the following reasons, the Court **DENIES** 10K Holdings and

Warner's Motion to Dismiss and **GRANTS IN PART** and **DENIES IN PART** 10K and 10K Publishing's Motion to Dismiss.[1]

### II.      BACKGROUND[2]

**A.     The Parties**

Danny Snodgrass, Jr., professionally known as Taz Taylor, is a songwriter and producer.  (Compl. ¶ 26.)  In 2013, Taylor founded TTB, a publishing company.  (*Id.* ¶ 27.)  In 2018, Taylor founded IMR, an independent record label.  (*Id.* ¶ 26.)  10K is an independent hip-hop record label.  (*Id.* ¶ 28.)  10K Publishing is 10K's affiliated music publishing company.  (*Id.* ¶ 29.)  10K Holdings is the "sole and/or majority owner" of 10K and 10K Publishing.  (*Id.* ¶ 32.)  In September 2023, Warner acquired a controlling interest in 10K Holdings.  (*Id.* ¶ 31.)  As a result, Warner, through 10K Holdings, controls the operations of 10K and 10K Publishing.  (*Id.* ¶ 32.)

**B.     The Label Agreement**

In 2019, IMR and 10K entered into a label agreement ("Label Agreement"),[3] with the intent to combine IMR's talent finding and artist acquisition expertise with 10K's platform to sign and release artists under a co-branded label.  (*Id.* ¶¶ 33–34.)

Under the Label Agreement, IMR and 10K agreed to share equally in their co-branded label's ownership, profits, and decision-making authority.  (*Id.* ¶¶ 34, 36.)  IMR agreed to provide talent finding and record executive services exclusively to 10K.  (*Id.* ¶ 37.)  10K assumed all duties related to distribution, sales, marketing, administration, and royalty accounting.  (*Id.* ¶ 41.)  The parties had mutual approval

---

[1] Having carefully considered the papers filed in connection with the Motions, the Court deemed the matters appropriate for decision without oral argument.  Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.

[2] All factual references derive from the Complaint or attached exhibits, unless otherwise noted, and well-pleaded factual allegations are accepted as true for purposes of this Motion.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[3] 10K Holdings and Warner request that the Court take judicial notice of the Label Agreement.  (Req. Judicial Notice ("RJN") ISO Mot. Ex. 1 ("Agreement"), Dkt. No. 31.)  The Court incorporates the Label Agreement by reference.  (Compl. ¶¶ 33–53; *see United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (permitting incorporation by reference where a "document forms the basis of the plaintiff's claim").  As such, the Court **DENIES AS MOOT** 10K Holdings and Warner's request.

rights "for all creative decision-making" and funds reallocation. (*Id.* ¶¶ 43–45.) IMR retained approval rights for recording budgets and marketing plans. (*Id.* ¶ 45.)

IMR and 10K agreed that IMR would receive a profit advance of $1,312,500 as a prepayment of its share of the net profits, which was to be recouped from IMR's fifty-percent share of the venture's net profits ("First Profit Advance"). (*Id.* ¶¶ 47–48.) The parties also agreed that 10K could deduct a thirty-percent distribution fee from the venture's gross revenue. (*Id.* ¶ 43.) The Label Agreement also included a "Venture Shortfall" provision allowing 10K to unilaterally terminate the venture if the cumulative losses exceeded $3,000,000. (Label Agreement ¶ 1b.)

**C.     The Amendment**

Taylor later created and produced several recordings released under the artist's name "Internet Money" ("Artist Recordings"). (Compl. ¶ 54.) Taylor released the Artist Recordings through the parties' venture, and they generated significant revenue. (*Id.* ¶¶ 55, 57.) As Taylor was not a label artist under the Label Agreement, the parties did not have a formal agreement concerning the revenues generated by the Artist Recordings. (*Id.* ¶ 57.) As such, in 2020, the parties amended the Label Agreement to formalize the treatment of the Artist Recordings and extend the term of their venture ("Amendment").[4] (*Id.* ¶ 58.) Under the Amendment, 10K agreed to provide IMR with an additional $2,000,000 profit advance ("Second Profit Advance"). (*Id.* ¶ 59.)

The Amendment attached an artist term sheet governing the Artist Recordings. ("Term Sheet").[5] (*Id.* ¶¶ 63–65.) The parties agreed that all revenues, deductions, and net profits attributable to the Artist Recordings would be kept in a separate account ("Artist Recordings Account") and would not be cross-collateralized with the parties' original account ("Main Account"). (*Id.* ¶ 68.) All other provisions in the parties' Label Agreement remained in full force and effect. (*Id.* ¶¶ 70–74.)

---

[4] The Court incorporates the Amendment by reference. (RJN ISO Mot. Ex. 2 ("Amendment"), Dkt. No. 31; Compl. ¶¶ 53–74); *see Ritchie*, 342 F.3d at 903.

[5] The Court incorporates the Term Sheet by reference. (Amendment Ex. A ("Term Sheet"), Dkt. No. 31; Compl. ¶¶ 63–64); *see Ritchie*, 342 F.3d at 903.

IMR fully performed its obligations under the Label Agreement and the Amendment. (*Id.* ¶ 75.) According to IMR, however, 10K violated its obligations and exercised control over the venture without obtaining IMR's approval. (*Id.* ¶¶ 76–79.) Beginning in 2021, 10K issued semiannual accounting statements that included millions of dollars in deductions without itemized breakdowns or supporting documentation. (*Id.* ¶¶ 80–86.) 10K's accounting statement for the first half of 2021 reported deductions exceeding $6 million in the Artist Recording Account and nearly $4 million in the Main Account. (*Id.* ¶ 82.) 10K's statements allegedly aggregated revenues in lump sums and omitted information concerning the source, composition, and legitimacy of the reported revenues and deductions. (*Id.* ¶ 83.) As a result, IMR was unable to verify the accuracy of the reported figures or determine whether 10K's deductions and royalty allocations were proper. (*Id.* ¶ 84.)

By the end of the first half of 2021, the Artist Recordings Account became profitable and reflected approximately $1,462,000 in net profits. (*Id.* ¶ 87.) Under the parties' accounting structure, approximately half of IMR's share of those profits was to be paid to IMR, while the remaining half would be applied to the unrecovered portion of the First Profit Advance under the Main Account. (*Id.* ¶ 88.) According to IMR, 10K reclassified and transferred the Second Profit Advance from the Main Account to the Artist Recordings Account and recouped that amount solely against IMR's profits attributable to the Artist Recordings. (*Id.* ¶ 89.) This accounting treatment transformed what would have been a positive balance of approximately $731,000 into an unrecovered deficit of approximately $1,268,000. (*Id.* ¶ 91.) 10K continued to use the same accounting system in subsequent accounting periods. (*Id.* ¶¶ 96–96.) IMR objected to 10K's statements and "repeatedly asked for additional information." (*Id.* ¶¶ 103–04.) 10K refused to provide IMR with the requested information. (*Id.* ¶ 104.) IMR also requested a formal audit seeking records for the accounting periods between June 30, 2021, and December 31, 2023. (*Id.* ¶ 105.) 10K refused to allow the audit. (*Id.* ¶¶ 107–08.)

**D.      The Alleged Publishing Venture**

Starting in late 2019, TTB and 10K also began discussing a separate potential "publishing venture."  (*Id.* ¶¶160–61.)   Under the publishing venture, TTB would bring songwriters to 10K and would receive a fifty-percent ownership interest in the copyrights (the "Publisher's Share") and a fifty-percent net publisher's share ("NPS").  (*Id.* ¶161.)  The parties discussed the proposed agreement and exchanged drafts.  (*Id.* ¶¶ 163–213.)   However, they "never executed any formal agreement."  (*Id.* ¶ 209.)  Relying on a potential publishing agreement, TTB introduced three songwriters to 10K and 10K signed them.  (*Id.* ¶¶ 170, 174, 179–80, 198.)  10K "never accounted to" or paid TTB "its share of royalties derived from those agreements."  (*Id.* ¶¶ 198–99.)  Instead, 10K "retained all money and rights" relating to those agreements.  (*Id.*)

**E.      This Litigation**

On November 4, 2025, IMR and TTB initiated this action against Defendants alleging breach of contract, accounting, breach of fiduciary duty, promissory estoppel, fraudulent inducement, unjust enrichment, and declaratory judgment.  (*Id.* ¶¶ 123–262.)   10K Holdings and Warner (collectively, "10K Parties") now move to dismiss pursuant to Rule 12(b)(6).  (10K-H/W MTD.)  10K and 10K Publishing (collectively, "10K"), separately move to dismiss pursuant to Rule 12(b)(6).  (10K MTD.)

**III.      LEGAL STANDARD**

A court may dismiss a complaint under Rule 12(b)(6) for lack of a cognizable legal theory or insufficient facts to support an otherwise cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).  To survive a dismissal motion, a complaint need only satisfy the "minimal notice pleading requirements" of Rule 8(a)(2)—a short and plain statement of the claim.  *Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003).  The factual allegations "must be enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  That is, the complaint must "contain sufficient factual

5

matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (citation modified).

The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. A court is generally limited to the pleadings and must construe all "factual allegations set forth in the complaint . . . as true and . . . in the light most favorable" to the plaintiff. *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001). However, a court need not blindly accept conclusory allegations, unwarranted deductions of fact, and unreasonable inferences. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

Where a district court grants a motion to dismiss, it should generally provide leave to amend unless it is clear the complaint could not be saved by any amendment. *See* Fed. R. Civ. P. 15(a); *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Leave to amend may be denied when "the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986). Thus, leave to amend "is properly denied . . . if amendment would be futile." *Carrico v. City & County of San Francisco*, 656 F.3d 1002, 1008 (9th Cir. 2011).

## IV.   DISCUSSION

10K Parties move to dismiss IMR's accounting and breach of fiduciary duty claims. (10K-H/W MTD 6.) 10K moves to dismiss Plaintiffs' accounting and breach of fiduciary duty claims, and TTB's fraudulent inducement claim. (10K MTD 8.)

### A.   10K Parties' Motion to Dismiss

10K Parties move to dismiss IMR's claims for accounting (Count 2) and breach of fiduciary duty (Count 3). (10K-H/W MTD 6.) As IMR's accounting claim depends on whether a relationship exists between the parties that might require an accounting, the Court addresses the breach of fiduciary duty claim first.

*1.      IMR's Breach of Fiduciary Duty Claim (Count 3)*

10K Parties argue that IMR's breach of fiduciary duty claim fails because the parties expressly disclaimed any fiduciary relationship and because IMR fails to plausibly allege the existence of a joint venture.  (*Id.* at 8–11.)

To state a claim for breach of fiduciary duty under California law, a plaintiff must allege (1) the existence of a fiduciary relationship giving rise to a fiduciary duty; (2) breach of that duty; and (3) resulting damages.  *Love v. The Mail on Sunday*, 489 F. Supp. 2d 1100, 1104 (C.D. Cal. 2007).  One way to show that a fiduciary relationship exists is by pleading the existence of a joint venture.  *Second Measure, Inc. v. Kim*, 143 F. Supp. 3d 961, 979 (N.D. Cal. 2015).  "[A] relationship short of a joint venture is not sufficient to sustain [a] claim for breach of fiduciary duty."  *Celador Int'l Ltd. v. Walt Disney Co.*, 347 F. Supp. 2d 846, 854 (C.D. Cal. 2004).

A joint venture is "an undertaking by two or more persons jointly to carry out a single business enterprise for profit."  *April Enters., Inc. v. KTTV*, 147 Cal. App. 3d 805, 819 (1983).  To create a joint venture, there must be (1) a joint interest in a common business enterprise; (2) an understanding to share profits and losses; and (3) a right to joint control.  *Id.*  "[T]he parties may create a joint venture despite an express declaration to the contrary."  *April Enters.*, 147 Cal. App. 3d at 820. "Whether a joint venture exists is a question of fact."  *Celador*, 347 F. Supp. 2d at 853.

Here, IMR plausibly alleges the existence of a joint venture sufficient to survive dismissal.  First, IMR plausibly alleges a joint interest in a common business.  For example, IMR alleges that 10K and IMR entered into the Label Agreement to combine "IMR's talent finding and acquisition expertise" with 10K's infrastructure "to sign and release artists under a co-branded label."  (Compl. ¶ 33.)  Thus, the parties agreed to operate a joint enterprise directed towards signing label artists and commercially exploiting their recordings.  (*Id.* ¶¶ 37–39.)  Accepting these allegations as true, IMR plausibly alleges a joint interest in a common business enterprise.

Second, IMR plausibly alleges a joint understanding to share profits and losses. IMR alleges that the parties agreed to divide the net profits equally, with each party receiving a fifty-percent share. (*Id.* ¶ 36.)  Moreover, under the Label Agreement, IMR received a First Profit Advance against its future share of net profits, which 10K could recoup only from IMR's fifty-percent interest in those profits. (*Id.* ¶¶ 47–50.)  Further, the Label Agreement also includes a Venture Shortfall provision tracking cumulative losses and authorizing 10K to terminate the venture if losses exceeded $3,000,000. (Label Agreement ¶ 1b.)   These provisions plausibly contemplate that both parties agreed to absorb the venture's economic downside.  As the parties agreed to divide profits equally, charged losses against future profits, and measured the venture's continued viability by cumulative shortfalls, IMR's pleaded facts reasonably support an inference that the parties expected both to share in the venture's financial risks.  *See Holtz v. United Plumbing & Heating Co.*, 49 Cal. 2d 501, 506–07 (1957) (holding that an agreement to share profits and losses "need not be formal or definite in every detail," but may be implied from the parties' actions and surrounding circumstances).  At the pleading stage, these allegations are sufficient to support a reasonable inference that the parties understood they would share the venture's losses.

Finally, IMR plausibly alleges joint control.  (Compl. ¶¶ 41–45.)  "Actual joint control, or at least the right of joint control of the common enterprise, is an essential element of joint adventure in California." *Joe Balestrieri & Co. v. Comm'r*, 177 F.2d 867, 871 (9th Cir. 1949).  Although joint control is an essential element of a joint venture, "this is not to say that there cannot be a joint venture where the parties have unequal control of operations." *Stilwell v. Trutanich*, 178 Cal. App. 2d 614, 619 (1960).  Under the Label Agreement, IMR and 10K had mutual approval rights of creative decision-making and funds reallocation.  (Label Agreement ¶ 11a; Compl. ¶¶ 43–45.)  Thus, IMR plausibly alleges "some degree of joint control," which is enough to survive dismissal. *Florists' Mut. Ins. Co. v. Floricultura Pac., Inc.*, No. 19-cv-05793-WHO, 2020 WL 6440039, at *4 (N.D. Cal. Apr. 3, 2020).

10K Parties attempt to escape this conclusion by arguing that IMR and 10K disclaimed a fiduciary relationship or joint venture status.  (10K-H/W MTD 6.)   In support, 10K Parties quote the Amendment's Term Sheet, which states in relevant part, that "[n]othing herein contemplates or constitutes [IMR] or [TTB] as [10K's] partner, joint venturer, agent or employee"; "[n]o fiduciary relationship or duty or special relationship of trust and confidence exists between [IMR] or [TTB], on the one hand, and [10K], on the other hand"; and "no such relationships or duties will be deemed to be created by . . . the business relations between [IMR] or [TTB], on the one hand, and [10K], on the other hand."  (Term Sheet ¶ 11.05.)  But a contractual term disclaiming the formation of a joint venture is not dispositive where the substance of the parties' relationship otherwise satisfies the elements of a joint venture.  *Celador*, 347 F. Supp. 2d at 854; *see April Enters.*, 147 Cal. App. 3d at 820 ("[T]he parties may create a joint venture despite an express declaration to the contrary.").

Here, the substance of the parties' relationship is inconsistent with the Term Sheet's boilerplate disclaimer.  As discussed above, IMR plausibly alleges that IMR and 10K agreed to share the net profits equally, jointly controlled creative and financial decisions, and jointly operated the venture as a single enterprise.  (Compl. ¶¶ 36–53.) Moreover, the disclaimer appears in the Amendment's Term Sheet only, and not in the parties' Label Agreement.  (*Compare* Label Agreement, *with* Term Sheet ¶ 11.05.) Thus, the disclaimer does not defeat IMR's joint venture allegations at the pleading stage.  Whether these allegations, if proven, amount to a joint venture is a question of fact.  *Celador*, 347 F. Supp. 2d at 854.  At this stage, the Court must accept IMR's allegations as true.  Accordingly, the Court **DENIES** 10K Parties' Motion to Dismiss IMR's breach of fiduciary duty claim on this basis.

### 2.    *IMR's Accounting Claim (Count 2)*

10K Parties argue that IMR's accounting claim fails because IMR cannot show "a relationship that could give rise to an obligation to furnish an accounting" and "a balance due that can be ascertained only by an accounting."  (10K-H/W MTD 11–12.)

To state a claim for an accounting under California law, a plaintiff must show that "a relationship exists between the plaintiff and the defendant that requires an accounting, and that some balance is due to the plaintiff that can only be ascertained through an accounting." *Teselle v. McLoughlin*, 173 Cal. App. 4th 156, 179 (2009). "An action for accounting is not available where the plaintiff alleges the right to recover a sum certain or a sum that can be made certain by calculation." *Id.*

As to the first element, the Court already found that IMR plausibly alleges the existence of a joint venture relationship between IMR and 10K. Thus, for purposes of IMR's accounting claim, IMR also plausibly alleges the relationship necessary to support an accounting claim. *See Rutherford v. FIA Card Servs., N.A.*, No. 2:13-cv-02934-DDP (MANx), 2014 WL 4402231, at *3 (C.D. Cal. Sept. 5, 2014) (noting that the relationship required for an accounting claim must only "reflect some degree of confidentiality or closeness"). As to the second element, 10K Parties argue that IMR alleges a contractual formula governing the parties' fifty-percent profit split and identifies specific sums owed, which demonstrates that damages can be calculated without an accounting. (10K-H/W MTD 12; 10K-H/W Reply 12–13, Dkt. No. 43.)

However, IMR alleges more than a mere disagreement over arithmetic. Instead, it alleges that 10K controlled the financial records necessary to determine net profits; issued improper statements; improperly classified or aggregated deductions totaling millions; refused to produce documents necessary to verify those deductions; and prevented IMR from conducting an audit. (Compl. ¶¶ 75–122.) These allegations support the inference that IMR cannot independently determine whether the reported net profits accurately reflect the venture's revenues. Thus, IMR plausibly alleges that determining the amount due requires the examination of 10K's records. *See Prakashpalan v. Engstrom, Lipscomb & Lack*, 223 Cal. App. 4th 1105, 1136 (2014) (holding that an accounting is appropriate where the amount due cannot be determined without examining the defendant's books and records). Accordingly, the Court **DENIES** 10K Parties' Motion to Dismiss IMR's accounting claim on this basis.

In sum, accepting IMR's allegations as true at this stage, IMR plausibly alleges the existence of a joint venture relationship between the parties that could give rise to fiduciary duties.  IMR also plausibly alleges that the parties' relationship requires an accounting and a balance due that can only be ascertained by an accounting.  Thus, the Court **DENIES** 10K Parties' Motion to Dismiss.

**B.      10K's Motion to Dismiss**

10K separately moves to dismiss Plaintiffs' claims for accounting (Counts 2 and 8) and breach of fiduciary duty (Counts 3 and 9), and TTB's claim for fraudulent inducement (Count 6).  (10K MTD 8.)  To the extent 10K seeks dismissal of IMR's claims for breach of fiduciary duty and accounting arising from the Label Agreement and subsequent Amendment, it advances substantially the same arguments as 10K Parties.  (*Id.* at 15–20.)  The Court rejects those arguments for the same reasons as discussed above.  Accordingly, the Court **DENIES** 10K's Motion to Dismiss IMR's accounting and breach of fiduciary duty claims (Counts 2 and 3).

However, TTB's claims for breach of fiduciary duty, accounting, and fraudulent inducement arise from the parties' alleged oral publishing agreement, rather than the Label Agreement or Amendment.  (Compl. ¶¶ 223–31, 240–52.)  As TTB bases these claims on a distinct contractual relationship, the Court addresses them separately.

*1.      TTB's Breach of Fiduciary Duty Claim (Count 9)*

10K argues that TTB's breach of fiduciary duty claim fails because TTB fails to plausibly allege a joint venture or any other fiduciary relationship arising from the parties' alleged oral publishing agreement.  (10K MTD 13, 16–20.)  10K contends that TTB pleads, at most, preliminary negotiations regarding a prospective publishing affiliation that never culminated in a final agreement.  (*Id.* at 13–14.)  10K also argues that, even if the Court were to assume an agreement existed, TTB fails to allege the elements of a joint venture.  (*Id.* at 15–18.)  TTB contends that it properly pleads a "joint venture" because TTB agreed to bring songwriters to 10K and collaborated with 10K in negotiating their agreements.  (Opp'n 10K MTD 12–13, Dkt. No. 41.)

Under California law, a joint venture "*can* be created orally." *Goodworth Holdings Inc. v. Suh*, 239 F. Supp. 2d 947, 956 (N.D. Cal. 2002). However, the plaintiff must still plausibly allege facts demonstrating (1) a joint interest in a common business; (2) an understanding to share profits and losses; and (3) a right to joint control. *April Enters.*, 147 Cal. App. 3d at 819.

Here, TTB does not dispute that the parties never reduced the alleged oral publishing agreement to writing. (Compl. ¶ 209; Opp'n 10K MTD 12–13.) Instead, TTB alleges that the parties discussed a *potential* publishing agreement under which TTB would refer songwriters to 10K in exchange for fifty-percent of "its Publisher's Share" and fifty-percent of the "so-called net publishing share" generated by those writers. (Compl. ¶¶ 160–70.) But TTB own allegations undermine the existence of a publishing agreement. TTB alleges that the parties continued negotiating the terms of their relationship, that TTB inquired whether a publishing arrangement was "still on the table," that the parties exchanged drafts, that 10K's draft was inconsistent with TTB's alleged understanding, and that they ultimately "never executed any formal agreement." (*Id.* ¶¶ 175, 203–04, 209.) These allegations are inconsistent with the existence of a joint venture because the parties continued to negotiate whether, and on what terms, they would enter a publishing relationship. At most, these allegations plausibly suggest ongoing negotiations toward a future agreement. Thus, even when viewed in the light most favorable to TTB, these allegations fail to plausibly suggest that the parties formed a joint venture through the alleged oral publishing agreement.

Nor does TTB adequately plead the remaining elements of a joint venture. Unlike the Label Agreement, the alleged publishing agreement lacks any provisions supporting TTB's conclusory characterization of the parties' relationship as a joint venture. (*Id.* ¶¶ 246–52.) Although TTB alleges an anticipated sharing of publishing revenues, TTB fails to allege any facts supporting the inference that the parties also agreed to share the publishing enterprise's losses. Unlike the Label Agreement, which tied each party's financial return to the venture's overall profitability through the First

Profit Advance and a Venture Shortfall provision, TTB fails to allege that the alleged oral publishing agreement contains a comparable mechanism allocating the financial risks of a joint enterprise.

TTB likewise fails to plausibly allege joint control.  TTB's own allegations establish that 10K alone signed the publishing agreements with the three songwriters, administered those agreements, and "retained all money and rights" relating to those agreements.  (*Id.* ¶¶ 198–99.)  These allegations describe a relationship in which 10K exercised unilateral control over the alleged publishing venture.  Accordingly, TTB fails to plausibly allege the existence of a publishing joint venture between the parties.

As TTB fails to plausibly allege the existence of a joint venture, it likewise fails to allege the fiduciary relationship necessary to support its breach of fiduciary claim. Accordingly, the Court **GRANTS** 10K's Motion to Dismiss TTB's claim for breach of fiduciary duty (Count 9).  As amendment may cure the deficiencies noted above, dismissal is **WITH LEAVE TO AMEND**.

2.    *TTB's Accounting Claim (Count 8)*

10K argues that TTB's accounting claim fails because TTB fails to allege that a fiduciary relationship exists between the parties.  (10K MTD 20–22.)

As discussed above, under California law, to allege a claim for an accounting, the plaintiff must show a relationship between the plaintiff and the defendant requiring an accounting and a balance due to the plaintiff that can only be ascertained through an accounting.  *Teselle*, 173 Cal. App. 4th at 179.

As TTB fails to plausibly allege a relationship upon which its accounting claim relies, TTB's claim lacks the predicate required under California law.  *See id.* (requiring a predicate relationship between the plaintiff and defendant that would require an accounting).  Accordingly, the Court **GRANTS** 10K's Motion to Dismiss TTB's accounting claim (Count 8).  As amendment may cure the deficiencies noted above, dismissal is **WITH LEAVE TO AMEND**.

     *3.     TTB's Fraudulent Inducement Claim (Count 6)*

10K argues that TTB's fraudulent inducement claim merely repackages its contract-based allegations arising from the alleged publishing agreement and, in any event, fails to satisfy Rule 9(b)'s heightened pleading standard.  (10K MTD 22–26.) 10K contends that TTB fails to identify specific misrepresentations and relies largely on conclusory allegations to plead falsity and fraudulent intent.  (*Id.*)

To plead a claim for fraudulent inducement under California law, a plaintiff must allege (1) a misrepresentation, (2) knowledge of falsity, (3) intent to defraud, (4) justifiable reliance, and (5) resulting damage.  *Lazar v. Superior Ct.*, 12 Cal. 4th 631, 638 (1996).  Fraudulent inducement is a claim sounding in fraud and must be pleaded with particularity as required under Rule 9(b).  *Eng v. JPMorgan Chase Bank, N.A.*, No. C 14-04626 JSW, 2015 WL 12781214, at *3 (N.D. Cal. May 4, 2015).  To plead with particularity, a party must plead "the time, place, and specific content of the false representations, as well as the identities of the parties to the misrepresentations."  *Swartz v. KPMG, LLP*, 476 F.3d 756, 764 (9th Cir. 2007). "A pleading satisfies Rule 9(b) if it identifies 'the who, what, when, where, and how' of the misconduct charged."  *MetroPCS v. SD Phone Trader*, 187 F. Supp. 3d 1147, 1150 (S.D. Cal. 2016) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)).  The plaintiff must "set forth more than the neutral facts necessary to identify the transaction [and] must set forth what is false or misleading about a statement, and why it is false."  *Vess*, 317 F.3d at 1106 (emphasis omitted).

TTB fails to satisfy Rule 9b's heightened pleading standard.  TTB alleges that "[b]eginning in November 2019 and continuing through 2022," 10K made "numerous false representations" "orally and in writing" that TTB would receive a fifty-percent interest in the Publisher's Share and NPS under the alleged publishing agreement. (Compl. ¶ 224.)  But TTB fails to identify which statements were false, when they were made, where they were made, or the circumstances under which those statements were made.  *Vess*, 317 F.3d at 1106.  Instead, it aggregates multiple communications

spanning approximately three years without distinguishing the alleged representations or identifying the specific statements that induced TTB to act.  (Compl. ¶¶ 157–213, 224–31.)  Such generalized allegations do not satisfy Rule 9(b)'s requirements.

Accordingly, the Court **GRANTS** 10K's Motion to Dismiss TTB's fraudulent inducement claim (Count 6).  As amendment may cure the deficiencies noted above, dismissal is **WITH LEAVE TO AMEND**.

## V.    CONCLUSION

For the reasons discussed above, the Court **DENIES** 10K Parties' Motion to Dismiss, (Dkt. No. 30), and **GRANTS IN PART** and **DENIES IN PART** 10K's Motion to Dismiss, (Dkt. No. 32).  As to 10K's Motion to Dismiss, the Court **GRANTS** the Motion and **DISMISSES** TTB's claims for fraudulent inducement (Count 6), accounting (Count 8), and breach of fiduciary duty (Count 9) **WITH LEAVE TO AMEND**.  The Court **DENIES** 10K's Motion in all other respects.

Plaintiffs may amend as specified above to cure the identified deficiencies.  If Plaintiffs choose to amend, they must do so within **twenty-one (21) days** of the date of this Order, in which case Defendants shall answer or otherwise respond within **fourteen (14) days** of the filing.  If Plaintiffs choose not to amend, all claims dismissed with leave to amend shall be deemed dismissed with prejudice as of the lapse of the deadline to amend.  In that event, Defendants shall answer within **fourteen (14) days** of the lapsed deadline.

**IT IS SO ORDERED.**

July 8, 2026

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**